ORKIN EXTERMINATING COMPANY, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 87–8285.

United States Court of Appeals, Eleventh Circuit.

July 15, 1988.

Frank C. Jones, John C. Staton, Jr., Sylvia M. King, Michael Eric Ross, Atlanta, Ga., for petitioner.

Melvin H. Orlans, F.T.C., Office of Gen. Counsel, Washington, D.C., Katharine B. Alphin, Chris M. Couillou, F.T.C., Atlanta, Ga., for respondent.

Before VANCE and CLARK, Circuit Judges, and GARZA *, Senior Circuit Judge.

CLARK, Circuit Judge:

Orkin Exterminating Company ("Orkin" or "the company"), a wholly owned subsidiary of Rollins, Inc., ("Rollins") has petitioned this court for a review of an order issued by the Federal Trade Commission ("FTC" or "the Commission") which requires Orkin to cease and desist from conduct which the Commission found to constitute unfair acts or practices within the meaning of section 5 the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a)(1), (2) ("Section 5").[1] The Commis-

---

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Section 5 provides, in pertinent part:
 (a) **Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade**
 (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
 (2) The Commission is empowered and directed to prevent persons, partnerships, or corporations ... from using unfair methods of competition in or affecting commerce and

sion found that Orkin violated section 5 by unilaterally breaching over 200,000 contracts with its customers. Having concluded that the Commission committed no errors, and that the Commission acted within its authority, we affirm and enforce the Commission's order. *See* 15 U.S.C. § 45(c), (d) (vesting courts of appeals with jurisdiction to affirm, enforce, or modify, or set aside Commission orders).

## I

According to its officers, Orkin is the largest termite and pest control company in the world.[2] Among the services which Orkin offers to its customers is the treatment of houses, buildings and other structures for the destruction of and protection against termites and other wood infesting organisms. Orkin's agreements with its customers to provide these services are typically embodied in standard printed forms which are not subject to modification by Orkin's agents or customers.

Prior to 1966, Orkin's customers could purchase guarantees for continued protection of a treated structure by paying a specified fee. These guarantees lasted for a stated period, typically between five and fifteen years. In 1966, Orkin began to offer similar guarantees that were, by the terms of its contracts, to last the "lifetime" of a treated structure. Between January 1966, when Orkin started to offer these "lifetime" guarantees, and February 1, 1975, Orkin's contracts for termite protection and control ("pre–1975 contracts") provided that a customer could renew the coverage of its "lifetime" guarantee by paying an annual renewal fee, the amount of which was specified in the contract. The contracts state that as long as a customer continues to pay this annual fee, the guarantee remains in effect for the lifetime of the treated structure, unless the structure is structurally modified after the initial treatment date.

Although these contracts varied slightly from time to time with regard to the types of guarantees available,[3] each contained a provision similar to those quoted below. For example, a contract dated November 30, 1966 contains this language:

### GUARANTY

The Guaranty checked above will be issued and delivered to the Purchaser upon completion of initial treatment. Guaranty will be effective so long as payment is made in accordance with the Terms and Conditions of this Service Order.

It is further agreed that Guaranty will provide for an initial term of:

[X] 12 months. ORKIN will reinspect the premises upon expiration of the initial term and upon receipt of the Annual Renewal Fee [$18.00].

. . . .

Guaranty at the sole option of the Purchaser may be renewed annually by making payment of the Annual Renewal Fee on or before the renewal date of each subsequent year.

Record, Vol. II at 385. A February 5, 1972 contract provides:

### ORKIN'S CONTINUOUS PROTECTION GUARANTEE

Orkin's Continuous Protection Guarantee will provide protection of the above named property including Annual Reinspections upon payment of the initial

---

unfair or deceptive acts or practices in or affecting commerce.
15 U.S.C. § 45(a)(1), (2).

**2.** Our statement of the facts, which are undisputed unless otherwise indicated, is drawn from the Commission's opinion, reported at 108 F.T.C. 341 (1986).

**3.** Orkin offered several kinds of lifetime guarantees, including a lifetime retreatment guarantee, a lifetime retreatment and repair guarantee and a lifetime guarantee on pretreatment work on new construction. Generally, the first two of these guarantees provide that after initial treatment and at no extra cost to the customer, Orkin respectively will retreat the covered structure if new infestations occur and make repairs (up to a stated dollar maximum) if it is established that the new damage occurred after initial treatment. The pretreatment guarantee is similar but applies to new construction rather than to existing structures.
108 F.T.C. at 343 (citations to record omitted).

charges and an Annual Renewal Payment of $37.00 starting February 1973 and each February thereafter.[4]

The type of Guaranty checked above will be issued and delivered to the Purchaser upon completion of initial treatment. Guaranty will be effective for an initial period of 12 months and thereafter so long as payments are made in accordance with the Terms and Conditions of this Contract.

Record, Vol. II at 384. A November 2, 1973 agreement contains this variation:

## ORKIN CONTINUOUS PROTECTION GUARANTEE

The guarantee checked above will be issued to the buyer upon completion of initial treatment. The Guarantee will cover the above named premises and will be subject to the General Terms and Conditions on the reverse side hereof. Its coverage, including annual reinspection, will be effective for a period of 1 years upon payment of the initial charges and thereafter for a period of Life years, so long as renewal payments of $15. are made annually.

Record, Vol. III at 422. In addition to these guarantee provisions, all of the contracts stated specifically that Orkin could adjust the annual renewal fee in the event of a structural modification to the treated premises.[5] No other provision in the contract indicates that these fees are subject to increases.

For six months during 1968, by way of billboards, magazines, and radio and television spots, Orkin promoted its termite control services through an advertising campaign which Orkin labelled the "Orkin 12 Point Plan." "Point 6" in this campaign, printed in a pamphlet issued to consumers, clearly indicated that annual renewal fees were not subject to increases:

LIFETIME GUARANTEE Orkin's lifetime termite protection plan includes annual reinspections and retreating when necessary. This protects the property against termite reinfestation for the life of the structure provided the lifetime guarantee is renewed annually. The yearly premium for this lifetime protection *is very modest and never increases.* In case of a sale, the guarantee is transferable.

Record, Vol. II at 351 (emphasis in original). The "Orkin 12" campaign was discontinued before its scheduled expiration date because it had not been effective. Orkin does not contend that the contracts it made during this period in 1968 are in any way materially different from all other pre–1975 contracts.

In 1978, Orkin began to consider increasing the annual renewal fees contained in the pre–1975 contracts. Rollins's general counsel concluded initially that there was no contractual basis for an increase. Yet convinced that Orkin could not have intended to lock the company into a perpetually fixed contract, he sought the advice of the company's law firm. A memorandum produced by the law firm considered the question whether "there [are] any grounds for the claim that a contract which may be renewed or extended from year to year, indefinitely, is unenforceable." It concluded that one unidentified Orkin contract appeared "to be of *indefinite* duration" and would therefore be "terminable by Orkin after a reasonable period of time." Record, Vol. II at 337 (emphasis in original). Rollins's general counsel endorsed the memorandum's legal conclusions to Orkin's management. Record, Vol. II at 343–44.

In early 1980, Gary W. Rollins, Orkin's president, prepared a memorandum for

---

**4.** The underlined words are handwritten in the original agreements.

**5.** The following language is typical:

This agreement covers the premises diagramed on the Graph and Specification Sheet bearing the Contract Number as of the date of actual treatment, and in the event the premises are structurally modified, altered or otherwise changed after the date of initial treatment, this agreement shall terminate unless a prior written agreement shall have been entered into between the Owner and the Company to reinspect the premises, provide additional treatment and/or adjust the Annual Renewal Fee.

Record, Vol. III at 398.

Rollins's president R.R. Rollins, outlining the " 'pros and cons' regarding raising the renewal amount" of the pre–1975 contracts. That memorandum reads as follows:

PROS

1. Potential income increase of $2,286,-614 (# 232,969 accounts valued at $6,017,406 × 40% increase less 5% cancellations)

CONS

1. A few customers advised by salesmen and literature that renewal amount would be fixed.

2. State regulatory agencies (Pest Control, Consumer Protection, etc.) could interpret our contract in some cases to imply the renewal amount is fixed. Those who obtain old proposal information will discover we put this in writing.

3. Our longer term employees might feel that we are going back on our word.

4. There could be customer lawsuits and complaints.

OPTIONS

1. Leave as is.

2. Write customers and put on voluntary basis.

3. Meet with individual state regulatory and consumer groups to obtain understanding and raise.

4. Raise and handle exceptions.

Record, Vol. II at 348.

In August 1980, Orkin began notifying customers who were parties to pre–1975 contracts that the company was going to increase its annual renewal fees. Increase notices were sent to approximately 207,000 pre–1975 customers.

The annual fees were raised to a minimum of $25 or by 40%, whichever was greater.... By August 1, 1984, Orkin had increased the annual renewal fees of approximately 142,902 customers with pre–1975 contracts. By May 25, 1981, Orkin had received an additional $1,257,-629 solely as a result of the fee increase to its pre–1975 customers, and [Orkin] estimates ... show that it had received increased revenues through 1984, from the same source, of $7,515,674.

108 F.T.C. at 347 (footnote omitted).

Many of Orkin's customers complained about the increase in their annual renewal fees. In addition, various officials in seventeen states questioned the lawfulness of Orkin's actions. But customers did not have any real alternative to paying the increased renewal fees. Although some of Orkin's competitors were willing to assume Orkin's obligations of the pre–1975 contracts, they apparently would not have done so "without imposing conditions that would have resulted in additional charges to Orkin's customers or subsequently raising the renewal fees as expressly permitted in their own contracts." 108 F.T.C. at 347 (footnote omitted).

In light of customer complaints, Orkin developed what it refers to as an "accommodation program." In a form letter sent to complaining customers, Orkin attributed the increase to inflation. It further explained that although the pre–1975 contracts "did not specifically mention increases," the increase was "both consistent with law and reasonable business standards," given the losses Orkin had absorbed. Record, Vol. III at 414. In a closing sentence, the letter says, "We appreciate your concern and hope that you now understand our position and will submit your renewal payment to keep your coverage in force." Record, Vol. III at 415. As an additional part of its "accommodation program," Orkin developed some limited exceptions to its across-the-board increases in the renewal fees for pre–1975 contracts. But customers were not directly informed of these exceptions in the form letter sent to complaining customers. Instead, John Raymond, Orkin's Director of Administrative Operations instructed Orkin's branch managers, by way of an August 13, 1980 memorandum, to handle complaints in the following manner:

If a customer tells you that our pre–1975 contract does not allow for an increase, you should explain that prior to the inflation spiral, practically no one had this provision in the contracts. Recent legal

rulings interpret this as meaning that the renewal fee shall remain unchanged for a *reasonable period* which we interpret to be no more than five years.

If a customer with a contract sold prior to 1975 questions the 40% increase, you should state that this increase does not bring their rate to current renewal levels, however, they are still being treated as a preferred customer. With inflation at approximately 10% per year, a 40% increase on a contract that remains constant for more than five years is still less than the cumulative inflation rate.

If the customer states they have sales literature that specifically states there will not be an increase in the renewal fee, you should ask them to read the statement to you. Some customers sold between 1967 and 1968 were given a pamphlet that stated the renewal fee would never increase. This statement was in the "Orkin 12 Point Plan." ...

. . . .

If any of your customers tell you they have a pamphlet in their possession that prohibits an increase you should ask them to read to you the exact wording. If the wording is not verbatum [sic] as stated in "point 6" above they are, in fact, eligible for an increase. If their material does have this statement, and you confirm it, then tell the customer a computer mistake was made and a corrected bill will be sent. Ask them not to pay until a correct bill is received.

Attached are the procedures to use to get the renewal fee corrected for the "point 6" customers. However, it is very important to remember that there are only a very few of these customers.

Record, Vol. III at 444–45. Eventually, Orkin decided to roll back all increases for customers who had entered into a contract in 1968, the year in which the "Orkin 12" campaign had appeared. Orkin's "accommodation program" expanded again in December 1980, when Raymond directed Orkin's branch managers to retract increases in renewal fees for all pre–1975 customers who stated that they believed the renewal fees were not subject to increase and relied on either (1) a sales presentation or (2) their own construction of the contract's terms.

As of August 1984, Orkin had, through its "accommodation program," rolled back the renewal fees of some 21,500 customers, approximately 16,000 of which were 1968 customers. Over 42,000 customers had cancelled their pre–1975 contracts, although the record does not reflect the reasons for these cancellations.

## II

In May 1984, the FTC issued an administrative complaint charging that Orkin had committed an unfair act or practice in violation of section 5. The complaint alleged that Orkin's pre–1975 contracts provided for a fixed annual renewal fee and that Orkin had violated the terms of these contracts by unilaterally raising the fees specified therein.

After conducting some pretrial discovery, counsel for the FTC supporting the complaint ("complaint counsel") moved for a summary decision pursuant to Rule 3.24 of the Commission's Rules of Practice for Adjudicative Proceedings, 16 C.F.R. § 3.24(a) ("Commission Rule 3.24"). Orkin filed a cross-motion for summary decision on the ground that conduct which is not alleged to be deceptive cannot constitute an "unfair act or practice" within the meaning of section 5. The Administrative Law Judge responsible for the case ruled in favor of the Commission. The ALJ found specifically that (1) that Orkin's pre–1975 contracts did provide for a fixed renewal fee and that Orkin had breached these contracts by attempting to raise the renewal fees; (2) these breaches of contract could constitute a violation of section 5; (3) there was substantial consumer injury; (4) consumers could not reasonably have avoided this injury; and (5) there were no countervailing benefits to consumers or competition. The ALJ entered an order requiring Orkin to roll back all fees in pre–1975 contracts to the levels specified in those contracts.

Orkin appealed the ALJ's decision to the Commission. The Commission affirmed all aspects of the ALJ's decision. In addition, the Commission concluded that summary

decision was appropriate because Orkin had failed to "set forth specific facts showing that there is a genuine issue of fact for trial," as is required by Commission Rule 3.24(a)(3) if a party wishes to avoid an adverse summary decision.

In its petition for review of the Commission's decision, Orkin has raised three basic arguments. First, Orkin claims that the Commission erred in concluding that the pre–1975 contracts unambiguously provided for a fixed annual renewal fee. Orkin charges that in disposing of this question summarily, the Commission also erred in failing to consider certain extrinsic evidence proffered by Orkin, and in making inappropriate findings of fact. Second, Orkin argues, as it did before the Commission, that the Commission exceeded the authority conferred upon it by section 5. Finally, Orkin argues that the Commission erred in refusing to consider evidence that Orkin relied upon advice of counsel.

### III

Orkin challenges the Commission's legal conclusion that the pre–1975 contracts were unambiguous with regard to the duration of the stated renewal fee and contends that the Commission should not have resolved the issued summarily, pursuant to Commission Rule 3.24. As the Commission acknowledged, it "cannot try issues of fact on a motion for summary decision but can only determine whether there are issues to be tried." 108 F.T.C. at 350.[6]

■ Under well-established principles of contract law, where the language of a contract is unambiguous, the legal effect of that language is a question of law. *Mason Drug Co., Inc. v. Harris*, 597 F.2d 886 (5th Cir.1979). Because the question of whether a contractual ambiguity exists is also a question of law, it "may be resolved summarily." C. Wright, A. Miller & M. Kane, 10A *Federal Practice and Procedure*, § 2730.1 at 279 (1983) (citing *Freeman v.*

*Continental Gin Co.*, 381 F.2d 459 (5th Cir.1967) (other citations omitted). A contract term is ambiguous if "reasonably susceptible to more than one interpretation." *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 780 (11th Cir.1982). But "[a]n ambiguity in a contract cannot be created by the mere assertion of a party to it." The fact that the meaning of a contract term is disputed likewise reveals no ambiguity. *Vreeland v. Federal Power Comm'n*, 528 F.2d 1343, 1351 (5th Cir.1976).

■ Orkin claims that its pre–1975 contracts are ambiguous as to whether Orkin may increase the annual renewal fee because the contracts do not speak to this question explicitly. In rejecting this argument, the Commission explained,

> It is undisputed that [the pre–1975 contracts] refer to "lifetime" services and guarantees. They specify an annual renewal fee, and they contain no language that suggests in any way that the renewal fee may change during the lifetime of the treated structure or that the duration of the stated renewal fee is different from the "lifetime" duration of the guarantee, assuming timely annual payments. The contracts provide expressly for fee adjustments in circumstances involving extension of the guarantee where the treated premises have been structurally modified. This express provision for certain adjustments makes the absence of language anticipating other adjustments even more significant.... The fact that the contracts Orkin used before 1966 and after 1975 contain express language permitting renewal fee increases regardless of whether structural modification occurred also strongly suggests that the contracts at issue are properly read to provide for a fixed renewal fee.

108 F.T.C. at 352–53 (footnote omitted). Orkin charges that the Commission "ignore[d] the fact that the lifetime guarantee

---

6. In deciding which cases and issues are subject to summary disposition, the Commission follows federal case law concerning the propriety of summary judgment pursuant to Fed.R.Civ.P. 56. 108 F.T.C. at 350 n. 11 (citing *The Hearst*

*Corp.*, 80 F.T.C. 1011, 1014 (1972); *Lehigh Portland Cement Co.*, 78 F.T.C. 1556, 1557 (1971)). We have evaluated the Commission's summary disposition of this case in light of the principles governing the operation of Fed.R.Civ.P. 56.

and the annual renewal fee that must be paid to continue it are *separate* features of the contracts." Orkin Brief at 32. Thus, Orkin argues, because the Commission necessarily "impl[ied] a durational term for the stated annual renewal fee," this reveals that the contract is ambiguous on this point. *Id.* at 33.

In fact, Orkin raised the argument that the guarantee and renewal fee provisions are severable before the Commission. We agree with the Commission that this argument runs contrary to the plain language in the various contracts. As the Commission explained,

> The box indicating that the customer selected a lifetime guarantee is on the same page as the provision for a specified annual renewal payment. The entire page is surrounded by a continuous geometric border of the sort often seen on printed form contracts. The integration clause, most frequently found on the second page, refers to "the complete agreement between the parties."
>
> We see nothing whatsoever on the face of the document to suggest that it is anything other than a single contract, nor has Orkin, aside from its conclusory assertion, provided any reason for the artificial distinction it proposes.

108 F.T.C. at 354–55 (footnote omitted). Even the most cursory reading of the pre–1975 contracts indicates that the guarantee and renewal fee provisions are inextricably linked, and more importantly, coextensive as to their duration. Of those contracts quoted above, each makes clear that the lifetime guarantee issued to customers will be renewed upon timely payment of *"the* Annual Renewal Fee," the amount of which is stated, "an Annual Renewal Payment of $37.00," or "renewal payments of $15."

One additional fact not emphasized by the Commission is that each contract contains language which further indicates that renewal of the guarantee (by payment of the *stated* fee) is to continue, so long as the covered premises are not structurally modified.[7] The first of those contracts we have quoted provides that the "Guaranty will be effective *so long as payment is made* in accordance with the Terms and Conditions" of the agreement. The second provides that the guarantee will remain in effect upon payment of the stated renewal fee "starting February 1973 and each February *thereafter.*" Even more devastating to Orkin's argument is the third of those contracts, which provides that the guarantee "will be effective for an initial period" "and *thereafter* for a period of Life years, *so long as*" the stated renewal payment is made "annually." Given the plain language of these agreements, we reject as unreasonable Orkin's suggestion that they are silent as to the duration of the stated annual renewal fees.[8]

---

**7.** This does not mean, as Orkin has suggested, that the contracts should be construed so as to provide for termination of the stated annual renewal fee after a "reasonable" period of time. It is true that contracts which are indefinite as to their duration are, upon notice, terminable at will after a reasonable period of time. *See A.M.R. Enterprises, Inc. v. United Postal Savings Ass'n*, 567 F.2d 1277, 1280–81 (5th Cir. 1978). This rule does not apply, however, to cases in which the disputed agreement provides for termination or cancellation upon the occurrence of a specified event. *See, e.g., Payroll Express Corp. v. Aetna Casualty & Surety Co.*, 659 F.2d 285, 291 (2d Cir.1981) (New York law); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1012 (7th Cir.1985) (Illinois law); *Southern Housing Partnerships, Inc. v. Stowers Mgmt. Co., Inc.*, 494 So.2d 44, 47–48 (Ala.1986). Thus, because Orkin's pre–1975 contracts provide specifically that the Company may raise the annual renewal fees upon structural modification of the treated premises, the duration of the stated annual renewal fee is not "indefinite," as that term is generally understood. As the Commission noted, and, as every homeowner knows, "Houses do not last forever absent structural modification." 108 F.T.C. at 355 n. 39.

**8.** The only case cited by Orkin in support of its severability argument is *A.M.R. Enterprises, Inc. v. United Postal Savings Ass'n*, 567 F.2d 1277 (5th Cir.1978). In that case, a corporation, by way of a commitment letter, agreed to make a one year loan to a real estate developer upon the fulfillment of certain conditions and the payment of a commitment fee. Before the developer could obtain a title insurance policy, the lender withdrew its commitment. Unable to meet its obligations, the developer lost the property when it was sold at a foreclosure sale. The developer sued the lender to recover the commitment fee and the cost of the property it had

The language of the contracts notwithstanding, Orkin argues that the Commission erred in refusing to consider certain extrinsic evidence which would prove that the contracts are ambiguous as to the duration of the annual renewal fees. As Judge Tuttle has noted, however,

> There is probably no better known rule of law than that which says that parol evidence may not be used to contradict the terms of an unambiguous contract.

*Peterson v. Lexington Insurance Co.*, 753 F.2d 1016, 1018 (11th Cir.1985) (applying Georgia law); *see also Certain British Underwriters at Lloyds of London v. Jet Charter Service, Inc.*, 789 F.2d 1534, 1535 (11th Cir.1986) (applying Florida law). Some jurisdictions do permit resort to parol evidence to prove the existence of a "latent ambiguity" as an initial matter. Thus, applying Alabama law in *Cathbake Investment Co. v. Fisk Electric Company, Inc.*, 700 F.2d 654, 656 (11th Cir.1983), we held that resort to parol evidence was proper to determine whether a contract contained a "latent ambiguity." Orkin suggests that *Cathbake* compels a holding that the Commission erred in not considering extrinsic evidence. Even if the "latent ambiguity" doctrine were operative here, it would not be "applicable ... because the parties' rights and obligations are clearly stated in the ... agreement, and there is no ambiguity that would warrant the introduction of parol evidence." *Hashwani v. Barbar*, 822 F.2d 1038, 1040 (11th Cir.1987) (per curiam) (applying Florida law). Even where a party seeks to prove a latent ambiguity, the interpretation urged by that party must be reasonable. No latent ambiguity exists unless the contract is actually susceptible to the meaning contended for by a party. *See Vineberg v. Brunswick Corp.*, 391 F.2d 184, 189 (5th Cir.1968) (applying Florida law). In seeking to prove a latent ambiguity, a party must attempt to resolve an actual ambiguity, not create one. *Zim v. Western Publishing Co.*, 573 F.2d 1318, 1323 (5th Cir.1978) (applying Wisconsin law). Because the interpretation urged by Orkin is unreasonable in light of the contracts' plain language, which excludes any possibility of an ambiguity, the Commission did not err in declining to consider such evidence.

Although the Commission recognized that it need not have undertaken to review Orkin's proffered extrinsic evidence, *see* 108 F.T.C. at 354, it did conduct a limited review:

> [W]e have examined the entire summary decision record to ascertain whether it reveals genuinely disputed issues of material fact as Orkin has alleged. We find none. Indeed, *to the extent that extrinsic evidence in the record is reliable and probative*, it supports our conclusion based on the contracts themselves.

*Id.* (emphasis added). Extrapolating from this statement, Orkin contends that the Commission violated basic principles governing summary judgment. To the extent that the Commission may have failed to view this extrinsic evidence in the light most favorable to Orkin—something which is not readily apparent—such error was of no legal significance because the Commission understood fully that it was not bound to review this evidence at all. At the end of its discussion of the pre–1975 contracts, the Commission said,

> In considering the merits of a motion for summary decision, the Commission must draw all factual inferences against the moving party. Here no factual inferences were necessary.
>
> > "[I]n actions involving written contracts the parol evidence rule may so operate that there is no relevant factual issue in dispute, so that summary judgment may be rendered ... under applicable principles of contract law."

The Commission has interpreted the pre–1975 contracts through a reading of un-

---

lost, alleging that the duration of the commitment, like the term of the loan, was one year. The district court granted summary judgment for the developer on the issue of the lender's liability for return of the commitment fee. Relying on the clear language of the commitment letter, we held that this was improper because the commitment letter's reference to a one year term "referred to the loan and not the duration of the commitment" itself. *Id.* at 1281. Orkin's pre–1975 contracts are simply not subject to such a reading.

disputed contract language with reference to applicable principles of contract law. We conclude, as did [the ALJ], that the "only logical interpretation of the Orkin 'pre1975' contracts is that the company has contracted to provide ... for a fixed annual renewal fee."

108 F.T.C. at 359–60 (citing 6 *Moore's Federal Practice* ¶ 56.17[11] at 56–785 (1987)) (quoting ALJ's Initial Decision, *reprinted in* 108 F.T.C. 263, 312 (1986)) (footnotes omitted). Because the Commission properly rejected the suggestion that Orkin's proffered extrinsic evidence could make the contracts ambiguous, it could not have erred in its review of this evidence.

## IV

Section 5 declares that "unfair or deceptive acts or practices in or affecting commerce" are unlawful, 15 U.S.C. § 45(a)(1); it also empowers the Commission to prevent certain entities from engaging in behavior that constitutes "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(2).

## A

Orkin contends that a "mere breach of contract," which does not involve some sort of deceptive or fraudulent behavior, is outside the ambit of section 5. In support of this proposition, Orkin cites cases that have interpreted state statutes similar to the FTCA, commonly referred to as a "little" section 5 laws, to require "something more" than a simple breach of contract before a given course of conduct can be found "unfair or deceptive." *See United Roasters, Inc. v. Colgate-Palmolive Co.,*

649 F.2d 985 (4th Cir.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (construing N.C.Gen.Stat. § 75–1.1(a)); *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10 (1st Cir.1985) (construing Mass.Gen.Laws Ann. ch. 93A § 2).

Orkin's argument is clearly inconsistent with the ways in which the FTC's unfairness authority has developed, as a result of both legislation and judicial interpretation. *See American Financial Services v. F.T.C.,* 767 F.2d 957, 965–72 (D.C.Cir.1985) ("*A.F.S.*"), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986). The Supreme Court, for example, has "put its stamp of approval on the Commission's evolving use of a consumer unfairness doctrine not moored in the traditional rationales of anticompetitiveness or *deception.*" *Id.* at 971 (emphasis added) (citing *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). Moreover, as the Commission noted, there is nothing which constrains it to follow judicial interpretations of state statutes in construing the agency's section 5 authority. *See* 108 F.T.C. at 361. Orkin's suggestion that we should rely on these cases overlooks the fact that it is the Commission itself which is charged, by statute, with the duty of prescribing "interpretative rules and general statements of policy with respect to unfair or deceptive acts or practices (within the meaning of section [5] )." 15 U.S.C. § 57a(a)(1).[9]

In 1980, the Commission promulgated a policy statement containing an abstract definition of "unfairness" which focuses

---

9. Even if we thought it prudent to take guidance from readings of these state statutes by federal courts, the cases cited by Orkin would be far from persuasive. The North Carolina Supreme Court, using section 5 as an interpretative guide to construe North Carolina's "little" section 5, has said that "[w]hile an act or practice which is unfair may also be deceptive, or vice versa, it need not be so for there to be a violation of the Act." *Johnson v. Phoenix Mutual Life Ins. Co.,* 300 N.C. 247, 266 S.E.2d 610, 621 (1980). This statement, consistent with section 5's disjunctive ("unfair or deceptive") language, substantially undercuts Orkin's position that a breach of contract must somehow be deceptive or fraudulent before becoming subject to the FTC's authority.

The Fourth Circuit's construction of the North Carolina statute in *United Roasters* is, therefore, hardly persuasive here. In addition, the Massachusetts statute construed by the First Circuit in the *Checkers* case provides specifically that courts "will be guided" in their interpretation of that statute "by the interpretations given by the Federal Trade Commission and the Federal Courts to section (5)(a)(1)" of the FTCA. Mass. Gen.Laws.Ann. ch. 93A § 2(b). In *Checkers,* the First Circuit did not construe section 5; it only cited a Massachusetts case which had held that "mere breaches of contract, without more, do not violate chapter 93A." 754 F.2d at 18 (citing *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243 (1979)).

upon unjustified customer injury. *See A.F.S.*, 767 F.2d at 971. Under the standard enunciated in this policy statement,

[t]o justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.[10]

It is true that the emphasis placed by the Commission on consumer unfairness is "of comparatively recent origin." *A.F.S.*, 767 F.2d at 971 n. 15 (citing Averitt, *The Meaning of "Unfair Acts of Practices" in Section 5 of the Federal Trade Commission Act*, 70 Geo.L.J. 225 (1981); Craswell, *The Identification of Unfair Acts and Practices by the Federal Trade Commission*, 1981 Wis.L.Rev. 107). But Orkin has not argued that the Commission's definition of what constitutes an unfair practice is itself outside the scope of the Commission's section 5 authority. Indeed, the courts reviewing applications of the Commission's unfairness standard have assumed, necessarily, that it is a valid standard. *See, e.g., A.F.S.*, 767 F.2d at 972.[11]

Nevertheless, as the ultimate authority charged with the construction of federal statutes, the courts must set aside Commission orders which are inconsistent with its statutory mandate or the intent of Congress. *FTC v. ColgatePalmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed. 2d 904 (1965). In deciding whether Orkin's conduct was "unfair," we owe "some deference" to the Commission's judgment on the issue. *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986).

We must therefore decide whether the Commission exceeded its authority in deciding that one company's unilateral breach of 207,000 consumer contracts could meet the Commission's definition of unfairness. As the Supreme Court has said,

Once the Commission has chosen a particular legal rationale for holding a practice to be unfair, ... familiar principles of administrative law dictate that its decision must stand or fall on that basis, and a reviewing court may not consider other reasons why the practice might be deemed unfair.

*Id.* 106 S.Ct. at 2016 (citations omitted). Of course, the Commission's three-part standard does little to isolate the specific types of practices and consumer injuries which are cognizable. But "the consumer injury test is the most precise definition of unfairness articulated by either the Commission or Congress"; consequently, we must resolve the validity of the Commission's order "by reviewing the reasonableness of the Commission's application of the consumer injury test to the facts of this case, and the consistency of that application with congressional policy and prior Commission precedent." *A.F.S.*, 767 F.2d at 972; *see also Indiana Federation of Dentists*, 106 S.Ct. at 2016.

**B**

■ The first prong of the unfairness standard requires a finding of substantial injury to consumers. In finding that Orkin's conduct had caused the requisite harm, the Commission said,

The harm resulting from Orkin's conduct consists of increased costs for services previously bargained for and includes the

---

**10.** This definition derived from a letter which the FTC wrote to Senators Danforth and Ford when Congress was considering an amendment to section 5 which would have defined unfair acts and practices. *See A.F.S.*, 767 F.2d at 970. Commonly referred to as the FTC's "Policy Statement" on the meaning of unfair acts and practices, the text of this letter is reprinted in H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33–40 (1983), and Trade Reg.Rep. (CCH) ¶ 50,421 at 55,947–51.

**11.** The D.C. Circuit has noted that the Commission's approach to consumer unfairness has not been met with congressional objection:

Congress has not seen fit to enact any more particularized definition of unfairness to limit the Commission's discretion. Indeed, the most significant congressional response to the Policy Statement has not been criticisms or rejection, but proposals to enact the Commission's three-part consumer injury standard into law.

*A.F.S.*, 767 F.2d at 982 (citation omitted).

intangible loss of the certainty of the fixed price term in the contract. 108 F.T.C. at 362. The Commission's finding of "substantial" injury is supported by the undisputed fact that Orkin's breach of its pre–1975 contracts generated, during a four-year period, more than $7,000,000 in revenues from renewal fees to which the Company was not entitled. As the Commission noted, although the actual injury to individual customers may be small on an annual basis, this does not mean that such injury is not "substantial." 108 F.T.C. at 362 (citing *In re International Harvester, Co.*, 104 F.T.C. 949, 1064 n. 55 (1984)); *see also A.F.S.*, 767 F.2d at 972 (Commission's Policy Statement makes clear that injury may be sufficiently substantial if it causes small harm to a large class of people); Averitt, 70 Geo.L.J. at 246.[12]

■ As for the second prong of the unfairness standard, the Commission noted that "conduct can create a mixture of both beneficial and adverse consequences." 108 F.T.C. at 364 (citing *International Harvester*, 104 F.T.C. at 1061). But because "[t]he increase in the fee was not accompanied by an increase in the level of service provided or an enhancement of its quality," the Commission concluded that no consumer benefit had resulted from Orkin's conduct. 108 F.T.C. at 364. The Commission also rejected various arguments that an order requiring Orkin to roll back its fee increases "would have adverse effects on its entire customer base and on many of its competitors." 108 F.T.C. at 365. On appeal, Orkin has not challenged the Commission's conclusions regarding consumer benefits and benefits to competition.

With regard to the third prong of the unfairness standard, the Commission concluded that consumers could not have reasonably avoided the harm caused by Orkin's conduct. The Commission's focus on a consumer's ability to reasonably avoid injury "stems from the Commission's general reliance on free and informed consumer choice as the best regulator of the market." *A.F.S.*, 767 F.2d at 976. *See also, International Harvester*, 104 F.T.C. at 1061.[13] As the Commission explained, "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." 108 F.T.C. at 366.

The Commission determined that "neither anticipatory avoidance nor subsequent mitigation was reasonably possible for Orkin's pre–1975 customers." *Id.* at 366. Anticipatory avoidance through consumer choice was impossible because these contracts give no indication that the company would raise the renewal fees as a result of inflation, or for any other reason.

As for mitigation of consumer injury, the Commission concluded that the company's "accommodation program" could not constitute an avenue for avoiding injury because relief from Orkin's conduct was available only to those customers who complained about the increases in the renewal

---

**12.** This is something which was recognized shortly after the original FTCA's passage. As Justice Brandeis explained in the context of an unfair competition case,

> [t]o justify filing a [section 5] complaint the public interest must be specific and substantial. Often it is so ... because the unfair method is being employed under circumstances which involve flagrant oppression of the weak by the strong. Sometimes, because, although the aggregate of the loss entailed may be so serious and widespread as to make the matter one of public consequence, no private suit would be brought to stop the unfair conduct, since the loss to each of the individuals affected is too small to warrant it.

*F.T.C. v. Klesner*, 280 U.S. 19, 28, 50 S.Ct. 1, 4, 74 L.Ed. 138 (1929) (footnote omitted).

**13.** "Normally," the Commission "expect[s] that marketplace to be self-correcting, and [it] rel[ies] on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market." Policy Statement, H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 37 (1983); Trade Reg.Rep. (CCH) ¶ 50,421 at 55,948. Yet "certain types of seller conduct or market imperfections may unjustifiably hinder consumers' free market decisions...." It is in these instances that corrective action by the Commission is justified. *A.F.S.*, 767 F.2d at 976 (citing Policy Statement, H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 37 (1983); Trade Reg. Rep. (CCH) ¶ 50,421 at 55,948).

fees. 108 F.T.C. at 367. Orkin contends that this question should not have been resolved on a motion for summary disposition, yet the company does not dispute that pre–1975 customers were not directly informed of the "accommodation program" unless they complained about an increase.[14] Given that consumer information is central to this prong of the unfairness inquiry,[15] it was proper for the Commission to determine summarily that the "accommodation program" did not provide pre–1975 customers with any real opportunity to mitigate their injuries.

The Commission also rejected the claim that customers could have avoided their injuries by electing to transfer their business to one of Orkin's competitors. Again, Orkin claims that this question was not subject to summary disposition. In affidavits that were before the Commission, some of Orkin's competitors did testify that they would assume the company's pre–1975 contracts at the renewal fees stated therein. Yet there is no evidence that Orkin's pre–1975 customers could have contracted with competitors for a renewal fee that would be subject to increase only upon structural modifications of the subject property. *See* 108 F.T.C. at 367.[16] Because Orkin failed to present such evidence, it was not error for the Commission to rule summarily that this purported avenue of relief did not create a real choice to consumers who might seek to avoid their injuries.[17]

### C

■ In addition to challenging the Commission's conclusions regarding its unfair-

ness standard, Orkin argues that the tests enunciated in the Commission's Policy Statement did not constitute the "real" basis of the Commission's decision. Orkin contends that the Commission did not adhere to the "familiar principle[ ]" that its decisions must rest on the basis which it actually articulates. This argument derives from the following statement in the Commission's opinion:

> The conduct at issue in this proceeding is not the breach of a single contract but ... rather the widespread, systematic program Orkin implemented to effect a unilateral modification of its own standard contract terms agreed to by many thousands of consumers.

108 F.T.C. at 361 (footnote omitted). Quoting this single sentence, Orkin reasons that "the Commission ruled that Orkin committed an unfair trade practice because there was a 'widespread, systematic program' to breach multiple contracts." It contends that "this new exception" to the Commission's otherwise limited authority under section 5 is not properly applied to the facts of this case because the Commission failed to make findings as to what specific acts constituted a "systematic program." Orkin Brief at 22. Accordingly, Orkin claims that the Commission violated the Administrative Procedure Act's requirement that agency adjudicative decisions set forth the basis of each material finding of fact. *See* 5 U.S.C. § 557(c).

Orkin's pericopal reading of the Commission's opinion is, to say the least, highly

---

**14.** As the Commission noted, "it would have been pointless for Orkin to effectuate the fee increase and, simultaneously, to notify its customers that if they preferred not to pay the higher amount, they need not do so." 108 F.T. C. at 367.

**15.** "Whether some consequence is 'reasonably avoidable' depends, not just on whether people know the physical steps to take in order to prevent it, but also on whether they understand the necessity of actually taking those steps." *International Harvester*, 104 F.T.C. at 1066.

**16.** In fact, the examples of competitors' contracts appended to two of these affidavits provide expressly for increases in renewal fees "[a]fter the fifth year and each year thereafter,"

"[a]fter the fifth year," and "after the first six (6) years and each six years thereafter." Record, Vol. I at 234, 235; Petitioner's Exhibit 11.

**17.** The additional grounds given by the Commission also support its conclusion. By transferring its business to another company, a pre–1975 customer would lose a benefit derived from dealing with a pest control firm of Orkin's stature. Transfer to a rival firm would also entail transaction costs associated with the "search for a reliable firm willing to provide the same services on the same terms ... and to complete a new agreement with that firm." 108 F.T.C. at 368.

misleading. It is clear from the Commission's opinion that the Policy Statement's consumer injury standard was the focus of its analysis. After a review of the undisputed facts in the case, the opinion contains a section entitled "Conclusions of Law," in which the Commission said,

> The issue before us is whether Orkin has engaged in an unfair act or practice under Section 5 by unilaterally increasing the renewal fees in its pre–1975 contract. This is not an action at common law for simple breach of contract. Rather it is an action under a federal statute that makes unlawful conduct causing *injury to consumers that is substantial, unavoidable and without countervailing benefits*. Because determining whether Orkin's conduct was "unfair" depends in large part on what consumers properly could have expected from Orkin under the pre–1975 contracts, we focus first on those contracts....

108 F.T.C. at 349 (emphasis added). In the subsection entitled "Scope of Section 5," the Commission wrote,

> Some consumer injury is inherent in any failure by a seller of goods or services to deliver according to the terms of a contract. The Commission will examine case by case whether the injury caused by a particular refusal to honor a contract obligation ... meet[s] the Commission's standard of "unfairness"....

108 F.T.C. at 360. Nothing about this opinion indicates that the Commission did anything other than that which it purported to do: apply the unfairness standard contained in its Policy Statement. The Commission's conclusion was simply that it was an "unfair" practice to breach over 200,000 contracts. We think this was a reasonable application of the Commission's unfairness standard.

 There remains, however, the question whether this case represents a significant departure from prior Commission precedent. We note what has been written in a recent law review article:

> Some of the oldest "unfairness" decisions involve sellers' refusals to live up to the terms of their contract. The Commission has often challenged sellers for traditional breaches of contract: failure to fill orders, delivery of inferior merchandise, refusal to return goods taken for repair, or refusal to return promised deposits. Recent trade regulation rules have focused on similar issues. These action have attracted little controversy. Breach of contract has long been condemned as a matter of law, economics, and public policy.

*Craswell,* 1981 Wis.L.Rev. at 128–29 (citing *National Trade Publication, Inc. v. F.T.C.,* 300 F.2d 790 (8th Cir.1962); *In re Moye,* 50 F.T.C. 926 (1954); *In re Interstate Home Equipment Co. Inc.,* 40 F.T.C. 260 (1945); *In re Zlotnick the Furrier, Inc.* 48 F.T.C. 1068 (1952)). Orkin claims the statements in this article are erroneous, for each of the cases cited therein involved some sort of deceptive practice. We think it important to remember, however, that section 5 by its very terms makes deceptive and unfair practices distinct lines of inquiry which the Commission may pursue. As is suggested above, while a practice may be both deceptive and unfair, it may be unfair without being deceptive. *See A.F.S.,* 767 F.2d at 971; *c.f.* Averitt, 70 Geo.L.J. at 265 (deception "is really just one specific form of unfair consumer practice"). Furthermore, the Commission has explained in its Policy Statement that it operates under the assumption that the unfairness doctrine "differs from, and supplements, the prohibition against consumer deception." H.R. Rep. 156, Pt. 1, 98th Cong., 1st Sess. 34 (1983); Trade Reg.Rep. (CCH) ¶ 50,421 at 55,946.

An adoption of Orkin's position would mean that the Commission could never proscribe widespread breaches of retail consumer contracts unless there was evidence of deception or fraud. The Supreme Court has, on more than one occasion, recognized that the standard of unfairness is "by necessity, an elusive one," which defies such a limitation. *See Indiana Federation of Dentists,* 106 S.Ct. at 2016 (citing *Sperry & Hutchinson,* 405 U.S. at 244, 92 S.Ct. at 905). The statutory scheme at issue here "necessarily gives the Commission an influential role in interpreting section 5 and in

applying it to facts of particular cases arising out of *unprecedented situations.*" *F.T.C. v. Colgate-Palmolive, Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965) (emphasis added). Accordingly, as the D.C. Circuit has observed,

> the Commission has, for all practical purposes, been left to develop its unfairness doctrine on an incremental, evolutionary basis. At this juncture, it is not for this court to step in and confine, by judicial fiat, the Commission's unfairness authority to acts or practices found to be deceptive or coercive. Our role is simply to review the Commission's exercise of its unfairness authority in this case.

*A.F.S.,* 767 F.2d at 982 (citations omitted). This case may be "unprecedented" to the extent it concerns non-deceptive contract breaches. But given the extraordinary level of consumer injury which Orkin has caused and the fact that deceptiveness is often not a component of the unfairness inquiry, we think the limitation of the Commission's section 5 authority urged by Orkin would be inconsistent with the broad mandate conferred upon the Commission by Congress. Thus, because the Commission's decision fully and clearly comports with the standard set forth in its Policy Statement, we conclude that the Commission acted within its section 5 authority.

## V

 Orkin's final argument is that the Commission erred in declining to consider evidence that it relied, in good faith, upon advice of counsel when it decided to increase its annual renewal fees. The company's position on this point derives from its renewed exegesis of the Commission's characterization of Orkin's conduct as the "implement[ation]" of a "systematic program." According to Orkin, because the Commission used these words, it necessarily found that Orkin "knowingly and willfully" breached its pre–1975 contracts. Because Orkin presented evidence that it had relied on the advice of counsel, it insists that a summary disposition was inappropriate. *See Irwin v. United States,* 558 F.2d 249, 252 (5th Cir.1977) (summary judgment

improper where there is genuine factual issue as to party's state of mind).

As our discussion above indicates, we think it clear that the Commission did not base its decision on any supposed finding that Orkin had acted willfully. More important, however, is the fact that Orkin's reliance upon counsel—a fact we assume— is irrelevant to an action brought pursuant to section 5. The unfairness standard, focusing as it does upon consumer injury, does not take into account the mental state of the party accused of a section 5 violation. "The purpose of the Federal Trade Commission Act is to protect the public, not punish the wrongdoer...." *Regina Corp. v. F.T.C.,* 322 F.2d 765, 768 (3d Cir.1963). Consequently, the "Commission has traditionally focused on the effects of conduct in order to afford the most protection possible for the public." *International Harvester,* 104 F.T.C. at 1085. In earlier cases concerning the use of deceptive advertising, courts held that proof of a party's intent has no bearing on the question whether a section 5 violation has occurred. *See Regina Corp.,* 322 F.2d at 768; *Koch v. F.T.C.,* 206 F.2d 311, 317 (6th Cir.1953). The Commission interprets its authority accordingly. *See, e.g., International Harvester,* 104 F.T.C. at 1085 (Commission may prohibit injurious conduct even if carried out in good faith). Given that a practice may be deceptive without a showing of intent to deceive, it is apparent that a practice may be found unfair to consumers without a showing that the offending party intended to cause consumer injury. Orkin has referred us to no authority, and we have found none, which indicates otherwise. As the Commission noted, Orkin's reliance upon legal advice is simply not germane to the question whether Orkin's conduct was unfair within the meaning of section 5. *See* 108 F.T.C. at 359.

## VI

For the foregoing reasons, we AFFIRM the Commission's cease and desist order. Upon affirming a Commission cease and desist order, a court of appeals must "issue its own order commanding obedience to the

terms of such order...." 15 U.S.C. § 45(c). The Commission's order is hereby EN-FORCED.

In spite of the court's enforcement of the Commission's cease and desist order, under the terms of the FTCA, Orkin is not subject to section 5's enforcement provisions until that order becomes "final." *See* 15 U.S.C. § 45(*l*) (penalties for violation of Commission orders; district court injunctions); 15 U.S.C. § 45(m) (civil actions for recovery of penalties). In this case, the Commission's order will not become final until (1) the period allowed for filing a petition for certiorari lapses; (2) a petition for certiorari filed by Orkin is denied; or (3) thirty days after the issuance of the Supreme Court's mandate, if the Supreme Court affirms or dismisses the petition for review. *See* 15 U.S.C. § 45(g).

Thus, if Orkin decides to appeal our decision, it will be free to collect inflated renewal fees for some time unless this court issues an order enjoining the company from so doing. *See* S. Kanwit, *Federal Trade Commission* § 9.04 at 9–9 (1987). Our authority to issue such an order is clear under section 5:

> Upon ... filing of [a] petition [for review of a Commission cease and desist order] ... the court [of appeals] shall have ... power to make and enter a decree affirming, modifying, or setting aside the order of the Commission and enforcing the same to the extent that such order is affirmed *and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgment to prevent injury to the public or to competitors pendente lite.*

15 U.S.C. § 45(c) (emphasis added).

Prior to oral argument, complaint counsel for the FTC moved for an injunction pendente lite to prohibit Orkin from violating the terms of the Commission's cease and desist order. A panel of this court ordered that the motion be carried with the case. Because we have now concluded that an injunction is necessary to protect the parties to pre–1975 contracts from the collection of the increased annual renewal fees, we GRANT the FTC's motion for an

injunction. Orkin is hereby enjoined from violating the terms of the Commission's cease and desist order. This injunction shall remain in effect until the Commission's order becomes "final" under the terms of the FTCA.