[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE MERITS
The plaintiff, Nathaniel Plotkin, alleges in this civil action that the defendants breached agreements to include him as an equity partner and/or to compensate him for legal services performed in connection with a plan to develop public housing in Bridgeport.[1]
In the first count of his fourth revised complaint, filed May 31, 2001, Plotkin alleges that Dilip Barot and companies which he controlled, Creative Choice Homes, Inc. ("CCH-Florida") and Creative Choice Homes Bridgeport, LLC ("CCH-Bridgeport"), and Laljeebhai R. Patel and the company he controlled, Capital Development Group, LLC, represented to the Bridgeport Housing Authority ("the housing authority") that Plotkin would be a member of a development team that proposed to be the preferred developer on a project known as Father Panik Village Replacement Housing, and that they breached the agreement to accord him this role.
In the second count, Plotkin alleges that the defendants were unjustly enriched by receiving his services related to preparing a response to the housing authority's request for proposals for the project.
Plotkin alleges in the third count that he was a third party beneficiary of a contract entered into between CCH-Florida and CT Page 16151 CCH-Bridgeport and the housing authority, and that this contract created a joint venture.
In the fourth and fifth counts, Plotkin alleges that the defendants breached a contract to allow him to provide legal services for the housing development project.
Plotkin alleges breach of a joint venture agreement in the sixth count.
In the seventh count, Plotkin alleges breach of an implied covenant of good faith and fair dealing with regard to the alleged contracts.
In the eighth count, Plotkin alleges that the defendants acted willfully, wantonly and recklessly in excluding him from the benefits of the developer contract with the housing authority.
In the ninth count, Plotkin alleges that the defendants fraudulently misrepresented that he would function as a member of the development team when they intended only to use his name and affiliations to secure preferred developer status and then eliminate him and use the services of others.
In the tenth count, Plotkin alleges that the defendants negligently misrepresented that they would use his services in the project.
In the eleventh count, Plotkin alleges that the actions of the defendants in inducing him to continue working for the alleged joint venture and in using his name to help obtain preferred development status without actually completing an agreement entitling him to a share in the profits constituted a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a et seq.
In count 12, Plotkin claims he is entitled to a declaratory judgment to determine his rights.
In the thirteenth count, Plotkin seeks injunctive relief against all defendants.
Barot, CCH-Florida and CCH-Bridgeport raise the following six special defenses: that the plaintiff had unclean hands as to the declaratory and injunctive relief; that the scope of the project has been substantially reduced since August 1996; and that if an oral joint venture agreement is found by the court to exist, Plotkin tortiously interfered with the agreement, and breached his fiduciary duty and his duty of good faith and fair dealing to the joint venture. CT Page 16152
Patel and Capital Development Group, LLC raise three special defenses. In their first special defense they claim they were unlawfully ousted from the project team by Barot "shortly after the plaintiff was asked to join the development team." They claim in their second special defense that after their ouster, Plotkin continued to work with the other defendants. Finally, Patel and Capital Development Group, LLC claim in their third special defense that they are not liable to Plotkin for a breach of contract or tort committed by any other defendant subsequent to their ouster.
This suit was filed in the Judicial District of Fairfield at Bridgeport. On November 6, 2000, this case was transferred to the complex litigation docket along with a related case, Patel v. Barot, X01 CV 96 0158463S. The two cases were tried together to the court after withdrawal of a claim for jury trial. The parties filed post-trial briefs. Defendants Barot, CCH-Florida and CCH-Bridgeport moved for a judgment of evidentiary nonsuit as to Plotkin's claims of breach of an agreement to pay legal fees. The court deferred consideration of this motion.
Findings of fact
On September 17, 1990, the federal department of Housing and Urban Development ("HUD") entered into a stipulated judgment in a civil action in which a tenant group had challenged conditions at a huge, decrepit, notorious public housing project in Bridgeport known as Father Panik Village. The consent decree provided for renovation or construction of approximately one thousand units of replacement housing. As part of the compliance effort, HUD was to fund a project known as the Father Panik Village Replacement Housing project, for which the Bridgeport Housing Authority was to select a preferred developer. In late 1995, the housing authority issued a request for proposals ("RFP") for development of six hundred units of housing to occupy scattered sites that had not been selected or acquired. The successful applicant was to win status as the "preferred developer," an entity entitled to develop and build the units authorized in the REP without having to bid on each segment or site individually.
The RFP did not specify whether the candidates for "preferred developer" status had to be corporations, partnerships, individuals or any other particular form of entity. The REP specified that each candidate must submit by January 26, 1996, a proposal containing specified documents and schedules. The RFP noted that applicants should "provide a list of people who will be assigned to this contract" and provide a biographical sketch for each. It further stated that proposals would be judged in part on the basis of the applicant's "[d]emonstrated successful experience in utilizing minority and women female (sic) owned CT Page 16153 business and compliance with HUD . . . Requirements" and "experience in hiring and training Section 3 residetits." (Ex. 211, p. 9.) "Section 3" is a reference to a portion of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u, which requires creation of opportunities for training and employment of low income residents and participation by local businesses.
Defendants Patel and Barot are businessmen who were introduced to each other by Charles Tisdale, a Bridgeport resident who had long been employed by anti-poverty agencies in Bridgeport, and who had also worked in the administration of Mayor Thomas Bucci and, for a time, at HUD.
In late 1995, Patel and Barot were working together on a public housing project in New Haven. Barot, whose business was based in Florida and who had virtually no contacts in Connecticut, had successfully completed public housing projects in several states. As of late 1995, Patel, who had left his position as a lawyer with a specialty in bonds at Schatz, Schatz, Ribicoff Kotkin in Hartford, was pursuing work as a consultant and developer and was no longer working as a lawyer. After the REP was issued for the Father Panik Village Replacement Housing project, Patel and Barot met with Tisdale to formulate a strategy for this project. Based on his conversations with Tisdale and his observations of municipal affairs in Bridgeport, Patel considered that the housing authority's selection committee was most likely to favor a proposal that included local people and people of color as participants. Patel and Barot communicated about the need to assemble a team to put together a response the Bridgeport REP and to be listed as participants in doing the work proposed. Patel had contacts with Dr. Murali Atluru, an engineer of Indian descent who was the principal in a Connecticut firm known as Diversified Technologies Corp. ("DTC"). Patel also had contacts with an African-American lawyer from Waterbury, Attorney Maurice Mosley, whose brother, Ernest Mosley, had been a deputy director of the Bridgeport Housing Authority.
Patel and Barot had worked with Rashid Hamid of Naek Construction on the unsuccessful proposal to develop the Elm Haven project in New Haven, and they asked him to provide estimates concerning construction costs and to be listed as the contractor in the proposal.
Charles Tisdale suggested to Patel that plaintiff Plotkin, a Bridgeport real estate lawyer in solo practice, should be made part of the team in order to emphasize its local character. Plotkin lived on the border of a low-income neighborhood in downtown Bridgeport and was acquainted with attorneys in the legal aid organization that would monitor the development of replacement housing. Tisdale represented that Plotkin's name on an application would be viewed favorably by the selection CT Page 16154 committee.
Plotkin had never served as legal counsel on a large development project. He had represented the buyer of an existing housing project and he had done the legal work associated with assembling lots to build a 20-unit single-site project known as Willow Mews, but he had asked another lawyer to help him with the zoning issues in that instance. He had appeared frequently on routine matters before Bridgeport zoning authorities. Plotkin was asked by Tisdale to attend a meeting of the group that had already begun discussing putting together a written proposal in response to the housing authority's RFP. He attended that meeting and some other meetings. Patel thereafter encouraged or concurred with Plotkin's attendance at meetings to discuss the project, and both Patel and Barot acted as though Plotkin were a member of the team they were assembling to make the proposal and to work on the project if they were successful. On January 23, 1996, Patel wrote a memo to Barot and Plotkin stating that at an evening meeting he, Plotkin, Attorney Mosley, and another person would "go through all aspects of the Bridgeport RFP" and he asked Plotkin to evaluate another person for inclusion on the team. (Ex. 159.) When the group met at the offices of DTC, the engineering firm, to draft the proposal, Plotkin contributed his own biographical sketch and those of two other Bridgeport lawyers, whose names he thought would impress the selection committee. One of these lawyers, Attorney Raymond Lyddy, had assisted Plotkin with the zoning work associated with the Willow Mews project, and Plotkin had in mind that Lyddy would assist him again on the Father Panik Replacement Housing project.
Plotkin testified that Patel and Barot led him to believe that Attorney Mosley would be lead counsel and would handle legal matters concerning finance, bonding and compliance with HUD requirements and that Plotkin would handle what Plotkin vaguely described as "Bridgeport matters," apparently including site acquisition and zoning.
In late December 1995 and January 1996, the various people assembled by Patel and Barot to formulate a proposal met and developed a written proposal for submission to the Bridgeport Housing Authority on January 26, 1996. No one ever used the term "joint venture" to describe their relationship or the activity of putting together the proposal in response to the REP. Barot had never, in fact, pursued a public housing development project as a joint venture. Rashid Hamid, the contractor, and Murali Atluru, the engineer, acknowledged that it is common practice in development circles for entities to contribute information and join in preparing a bid or proposal of this sort, and that contributors do not ordinarily thereby assume that they will share in the profits. In this instance, however, both Patel and Barot made vague statements suggesting CT Page 16155 that "team members" would realize some benefits from being considered team members and that team members would not be replaced when it came time actually to build the housing if preferred developer status was won. Their nonspecific assurances of benefits for those who joined the "team" induced Plotkin to spend time at meetings and to allow his name to be used in the proposal, helping to create the impression that the CCH-Florida proposal included local professionals who were likely to have an abiding interest in the welfare of the project.
None of the defendants, however, actually committed to any definite benefits for team members, and in particular not for Plotkin. Because of his impression, created by the words and conduct of Patel and Barot, that he either was or would become an equity owner in the project, Plotkin did not treat the other participants as clients, but regarded his expenditures of time and attention to the project as his contribution.
Though the cover of the proposal identified the applicant as "Creative Choice Homes, Inc. Team," the text of the proposal identified CCH-Florida as the applicant, asserting that "CCH has the expertise and demonstrated experience to perform the tasks required to complete the comprehensive planning and construction of up to 412 units of low income housing as well as providing additional units of moderate and mixed income housing." (Ex. 8.) Though the "team" is listed on the cover of the CCH proposal, the text of that proposal nowhere identifies Plotkin or any other team member as a co-proposer, and the proposal is signed by John F. Weir, who is identified as a senior vice-president of CCH-Florida.
Plotkin testified that Patel and Barot gave him the impression that since he was being listed as a "team member" in the application, that he was to receive a share of the profits from developing the housing units identified in the text. He had been requested to attend a meeting at the Holiday Inn in Bridgeport to discuss which team members should present the proposal to the housing authority's selection committee. He identified no conversation in which any of the defendants or anyone acting on their behalf made any representation to him defining the amount or extent of his share, and his testimony as to the alleged agreement was vague, indefinite, and equivocal. He stated that "it was indicated that I would perform legal services and would be brought on the team for that," but he did not state who actually made such a statement. He stated that Patel and Barot created "a general understanding" that team members would share in profits at the end of the development, and that Barot had stated that there would be plenty of money for all team members from the project; however, Plotkin produced no evidence that any defendant actually ever represented or agreed that Plotkin would be entitled to a particular, definite percentage or share. CT Page 16156
By a letter dated March 18, 1996, the Bridgeport Housing Authority advised John Weir, senior vice-president of CCH-Florida, that "we have selected your firm to become our designated Preferred Developer for the Father Panik Village Replacement Housing Plan subject to our negotiating a firm contract price." (Ex. 11.)
On behalf of CCH-Florida, Weir asked Plotkin to draft a development agreement. In April, Plotkin prepared a draft (Ex. 103) in which the parties were identified as the housing authority and CCH-Florida. Plotkin did not list himself or any other team member as a party' either in any preamble describing the contracting parties or in a signature line.
Patel urged Barot not to continue to use Plotkin's services in drafting and negotiating the actual contract with the housing authority but to use another attorney, Attorney Robert Berchem, whose contacts Patel thought were useful. At Patel's urging, Barot asked Attorney Berchem to draft the contract with the housing authority. When asked by team members to explain Berchem's role, Barot stated that Plotkin was not being replaced as a team member and that Berchem's services would be limited to the work on the developer contract. At Barot's request, Berchem also drafted the papers necessary to create CCH-Bridgeport, a limited liability company created for the Bridgeport project. In a letter dated Augnst 20, 1996, to Atluru of Diversified Technologies Corp. (Ex. 931), however, Barot, writing as president of CCH-Florida, described Berchem as "our attorney" and asked that any inquiries by Atluru's attorney concerning an agreement identifying the scope of the services to be provided by Atluru's company be directed to Berchem.
Though the housing authority had awarded preferred developer status to CCH-Florida, it agreed to add the new CCH-Bridgeport, LLC as a party in the formal agreement.
Concerned that they were being cut out of the project, various members of the team approached Clarence Craig, the housing authority's executive director, seeking to have him require CCH to include them as parties to the actual contract with the housing authority. Craig refused to be drawn into the argument and insisted that the housing authority would contract only with a developer, not with multiple entities. Only Barot and entities controlled by him were shareholders in the newly created CCH-Bridgeport, LLC.
After CCH-Florida won preferred developer status, the only services that Plotkin performed in addition to preparing an initial draft of the developer contract were to attend two meetings and prepare minutes. In April 1996, Barot began to distance himself from the members of the team that had been assembled to prepare the proposal and that had been listed CT Page 16157 as participants. While some of these people, notably, Attorney Mosley and Patel, shared Plotkin's belief that being a team member meant that they would ultimately share in the profits, no witness identified any agreement as to any particular percentage or share for any so-called team member.
Various witnesses who described themselves as team members had the impression that others who were so listed did not have the same arrangements as themselves. Plotkin, for example, considered that he was a team member for purpose of sharing profits but that another entity listed as a team member on Exhibit 8, Bevco Associates, was only a consultant to be paid on a fee-for-service basis. Plotkin testified that he considered DTC, not its principal; Dr. Atluru, to be the entity that was to be the team member, and that he likewise thought that Naek Construction Co., not its principal, Hamid, was to be a team member; however, he was unsure whether Patel and Barot were acting as individuals rather than on behalf of the companies in which they were the principals, that is, Capital Development Group, LLC and CCH-Florida, respectively.
Defendant Patel identified different persons and entities as equity members at various junctures in his testimony.
No witness testified that Barot or any agent of CCH-Florida or CCH-Bridgeport ever stated the percentage or extent of any team member's share, and no written agreement was ever offered into evidence. It appears that Patel and Barot used vague representations concerning a "team" to persuade Plotkin and others to have their names used in the proposal to the housing authority, but that no defendant ever made any explicit representation or agreed to any explicit terms concerning any share or compensation for these contributors. Plotkin made no notes concerning any discussion of the terms of any joint venture or the share each member was to receive. He did not know if there were to be six members or seven, and he did not know whether Patel or Barot individually were to receive part of the profits. Plotkin had never been involved in a joint venture at any time prior to the events at issue.
When the team members attempted to pin Barot down over the percentage to be received by each of them, Barot responded to the effect that he and Patel had not been able to agree over the terms of sharing the developer fees and the amount or share that each participant was to receive. The defendants never did come up with any concrete structure alloting shares of profits to team members. Instead, Barot took the position after April 1996 that all team members could expect was the opportunity to enter into contracts with CCH-Florida, or, later, CCH-Bridgeport, to perform services at agreed rates. CT Page 16158
Having failed to obtain any written contract specifying any share in profits between August 1996, when the formal agreement between the housing authority and CCH-Florida and CCH-Bridgeport was executed and December 1996, DTC, Naek and Attorney Mosley entered into contracts with Barot and his companies to perform services on the project. Plotkin sent John Weir a proposed retainer agreement. (Ex. 110.) Weir did not execute it but sent back a counterproposal (Ex. 113A), which was unacceptable to Plotkin.
Plotkin testified that he spent between 45 and 50 hours attending meetings from December 1995 through April 1996, and preparing the draft of the developer agreement that Attorney Berchem was brought in to complete. At the time of his deposition, Plotkin had not calculated his hours, and the court finds that his reconstruction in 2001 of time spent in 1995 and 1996, unaided by any time records, is merely an estimate.
Before performing these tasks, he had not informed any of the defendants that he would bill them for these services or that he would bill at any particular hourly rate. Though Plotkin testified on direct examination that he had orally identified his billing rate at the time he was attending meetings in December 1995 and January 1996, he admitted on cross-examination that he had never kept contemporaneous time records, had not issued bills at such an hourly rate for hours expended each month, and did not present any of the defendants with any document stating an hourly rate until December 1996. The court finds that he did not present any of the defendants with either an oral or written statement of his billing rate until December 1996.
After April 1996, Plotkin spent additional time, which he estimated at 50 hours, talking with other team members who felt they were being left out of the transaction after having been identified as part of it. Plotkin described these conversations as "efforts to keep the tam together." No evidence suggested that any of the time Plotkin spent on the latter activity was at the request any of the defendants. The subject of these discussions was the effort to get Barot and his companies to come to a definite agreement concerning each team member's share of the anticipated projects and role in completing the project. Plotkin never reached any agreement with any of the defendants either with regard to a definite share in a joint venture or for the right to perform any clearly specified legal services at any mutually agreed billing rate. He communicated his billing rate in writing in December 1996, after the defendants had made clear to him that he was not going to receive any share of any profits from the project.
Claims based on joint venture agreement
CT Page 16159
Plotkin asserts that because he was present as part of the team that put together the proposal for CCH-Florida to be the preferred developer for the Bridgeport project, and performed some services, he became an equal member of a joint venture. He further asserts that members of a joint venture need not prove that there was any agreement as to the share of profits to be received by each member, but that the court should simply assume that each member was to receive an equal share. The sole authority that Plotkin cites for the latter proposition is Dolan v.Dolan, 107 Conn. 342 (1928). In that case, where a husband and wife pooled their resources to purchase a home, the Supreme Court ruled that although title was in the wife's name, the purchase had been made as a joint venture in which both spouses were entitled to a half of the value of the property. Contrary to Plotkin's view, the Court did not state as a general proposition that the law construes all joint undertakings as entitling participants to equal shares, regardless of the extent of their contribution.
Plotkin argues as though he had performed a proportionate part of a joint undertaking under circumstances which indicated agreement by other participants that he was to receive an equal share of the proceeds, the situation at issue in Dolan v. Dolan, supra, 107 Conn. 342. No such proof was provided. Instead, Plotkin's claim is that the defendants represented that they would, to an unspecified extent, include team members in the project, but that they then failed to come to any specific terms as to the extent of any interest or share of any compensation. As Plotkin acknowledges at page 4 of his post-trial brief, "[d]uring [the] late Spring and Summer of 1996, the Team was unable to reach any resolution concerning the various Team Members' participation in the joint venture, the entity to be created to sign the BHA contract and their scope and role once the contract was signed." Plotkin characterizes this impasse as an "inability to reach an agreement with Dilip Barot." (Post-trial brief, p. 5.)
The law in Connecticut concerning arrangements that a party seeks to characterize as a joint venture has been clarified since the 1928 spousal property case on which Plotkin relies.
Under Connecticut law, the existence of a contract has consistently been held to be a matter not of law but of fact. Finley v. Aetna Life Casualty Co., 202 Conn. 190, 199 (1987), overruled on other grounds,Curry v. Burns, 225 Conn. 782, 786 (1993); Harry A. Finman Son, Inc.v. Connecticut Truck Trailer Service Co., 169 Conn. 407, 409 (1975);Randolph Construction Co. v. Kings East Corp., 165 Conn. 269, 272 (1973) ("[w]hether a contract exists is a question of fact for the court to determine"); accord, Bridgeport Pipe Engineering Co. v. DeMatteoCT Page 16160Construction Co., 159 Conn. 242, 249 (1970); Molloy v. Rourke,83 Conn. 196, 199 (1910); Manzin v. United Bank Trust Co.,6 Conn. App. 513, 516 (1986).
In order to prevail on his claim of breach of an oral agreement, Plotkin must prove that the defendants agreed to participate in a joint venture and agreed to terms definite enough to permit enforcement. While an oral agreement may be proved to have been reached even if some of the terms are not agreed to immediately, see Willow Funding Co., L.P. v.Grencom Associates, 63 Conn. App. 832, 843-44 (2001), numerous Connecticut cases require definite agreement on the essential terms for an agreement to be enforceable. Id.; Suffield Development AssociatesLtd. Partnership v. Society for Savings, 243 Conn. 832, 843 (1998) (agreement to make a loan that is not definite as to amount is not enforceable); LR Realty v. Connecticut National Bank, 53 Conn. App. 524,537, cert. denied, 250 Conn. 901 (1999) (agreement to subordinate mortgage not enforceable where no definite agreement as to position or amount to be subordinated).
In Coady v. Martin, 65 Conn. App. 758, 767-68 (2001), the Appellate Court recently held that where parties entered into a contract that provided that both would be "members" of a company but failed to agree on the percentage of equity to which each was entitled, the membership agreement was unenforceable because the extent of each party's interest was an essential term.
Modern authority clearly demonstrates that to form a valid and binding contract in Connecticut, including contracts to enter into activities that may later be characterized as "joint ventures," there must be a mutual understanding between the parties that is definite and certain regarding the essential terms. See Ubysz v. DiPietro, 185 Conn. 47, 51
(1981); Augeri v. C.F. Wooding Co., 173 Conn. 426, 429-30 (1977); LRRealty v. Connecticut National Bank, supra, 53 Conn. App. 534; Cavallov. Lewis, 1 Conn. App. 519, 520 (1984).
At most, Plotkin demonstrated that defendants Patel and Barot led him along with vague representations that he would in some unspecified way share in profits from the development venture. He did not prove that any of the defendants actually agreed to pay him any specific share of any profits earned on the project. He did not prove that he performed services that created an asset under circumstances in which agreement to a definite share were implicit by the conduct of the parties and the extent of his contribution to creation of the asset, as in Dolan v. Dolan, supra, 107 Conn. 342.
Claims based on performance of legal services
CT Page 16161
Plotkin additionally claims, in counts two, four and five, that the defendants owe him for performance of legal services. He did not prove the existence of any written agreement to provide services, and the court must therefore consider his claim for recovery on the other bases alleged in his complaint. Plotkin testified that he provided legal services both in connection with the preparation of the response to the REP and after CCH-Florida was announced to have won the competition.
As to the first category of efforts, Hamid and Atluru convincingly testified that entities working on a bid or proposal of this sort do not bill for work on the proposal but perform the services in the hope of future work and compensation. Before the proposal was assembled, Plotkin never presented any of the defendants with any proposed fee agreement or advised any of them that his services with regard to preparing the proposal must, unlike the contributions of others, be paid for at an hourly rate.
A different situation exists with regard to the preparation of a draft of the development agreement and time spent calling meetings and performing administrative tasks for the project. Plotkin testified that John Weir, vice-president of CCH-Florida, requested that Plotkin prepare a draft of the development agreement and attend and schedule meetings in the spring and summer of 1996. Plotkin, who was under the impression that performance of such services was part of his services as a team member, complied. Weir did not advise Plotkin that CCH-Florida denied that Plotkin had any such arrangement; however, CCH-Florida now contends that Plotkin may not recover for the reasonable value of these services because he had not first communicated his hourly rates in writing "before or within a reasonable time after commencing the representation," as is required by Rule 1.5(b) of the Rules of Professional Responsibility.
Plotkin did not know until after he had performed the work on behalf of CCH-Florida that this entity was taking a new position with regard to his role. When he became aware of this, he sent Weir a proposed fee agreement setting forth a billing rate of $175.00 per hour. The conduct of Patel and Barot and CCH-Florida in concealing their true intentions caused the delay in Plotkin's communication of his fee. Under the circumstances, the court finds that the fee was communicated "within a reasonable time after commencing the representation."
For another reason, the lack of a written fee agreement does not defeat Plotkin's claim for fees for the services Patel and Barot asked him to perform. The situation is analogous to the situation recognized by the Connecticut Supreme Court to be an exception to the Home Improvement Act's requirements that contracts be in writing. In Habetz v. Condon, CT Page 16162224 Conn. 231, 237 (1992), and Barrett Builders v. Miller, 215 Conn. 316,328 (1990), the Court ruled that where the failure to prepare a written contract required by statute resulted from bad faith conduct by the homeowner, a home improvement contractor's claim for compensation for services performed would not be barred. In this case, the fraudulent representations of Barot and Patel concerning the basis on which Plotkin was performing services were the cause of his failure to comply with Rule 1.5 before rendering the services.
Because of his understanding of his arrangement, Plotkin did not keep contemporaneous time records of his activities on behalf of Barot and CCH-Florida. He estimates that he spent a total of 45 or 50 hours attending meetings and preparing biographical sketches for the proposal and on drafting the developer agreement and scheduling meetings thereafter. On the basis of this testimony and inspection of the draft, the court finds that these activities, which Weir had requested Plotkin to undertake, reasonably involved thirty-five hours of legal work. Though Plotkin has claimed that he expended 45 to 50 hours, the court finds that ten of the hours expended were on participation in preparing the proposal (Ex. 8), an activity for which where was no reasonable expectation of fees as all participants were donating their services in the hope of winning the competition. While Plotkin testified that his customary billing rate in 1996 exceeded $175 per hour, that rate is the only billing rate proven to have been communicated to CCH-Florida in writing.
Plotkin has proven that defendants Patel, Barot and CCH-Florida are all liable to him on these counts. Plotkin shall recover $6,125.00 ($175.00 x 35 hours).
CUTPA claim
Plotkin alleges that the defendants violated CUTPA in inducing him to lend his name and spend his time on the CCH-Florida proposal to the housing authority and then failing to enter into any actual, specific contract to include him as an equity shareholder in the project. In essence, Plotkin claims that the defendants acted deceptively in saying that they would enter into a definite financial arrangement with him and then failing to do so. Plotkin alleges that he participated in reliance on the promise to enter into a binding arrangement and that the defendants failed to fulfill their duty to enter into such an arrangement, but simply cut him out of the project when it suited them to do so. The essence of his claim is breach of an agreement to enter into a contract.
To-prevail on a claim of a violation of CUTPA, a plaintiff must prove that he suffered an ascertainable loss through an unfair trade practice. CT Page 16163
Conn. Gen. Stat. § 42-110b (a), the central prohibition of CUTPA, provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."
The Connecticut Supreme Court has summarized the applicable criteria as follows:
 1. whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
 2. whether it is immoral, unethical, oppressive or unscrupulous;
 3. whether it causes substantial injury to consumers, competitors, or other businessmen.
Hartford Electric Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 368
(1999); Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559,591-92 (1995), citing Conaway v. Prestia, 191 Conn. 484, 492-93 (1983).
In Normand Josef Enterprises, Inc. v. Connecticut National Bank,230 Conn. 486, 522-23 (1994), the Supreme Court ruled that all three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one or more of the criteria or because to a lesser extent it meets all three.
Conn. Gen. Stat. § 42-110b (b) provides that in determining whether a practice violates CUTPA, the Connecticut's courts shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act ("FTCA"),15 U.S.C. § 45 (a)(1), as amended.
Guidance from the Federal Trade Commission and the federal courts suggests that a failure to comply with the representations made in an agreement does not constitute an unfair trade practice. In OrkinExterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1367 (11th Cir. 1988), cert. denied, 488 U.S. 1041 (1989), the Court of Appeals for the Eleventh Circuit held that the Federal Trade Commission had jurisdiction under section 5 of the FTCA to sanction as an unfair trade practice the CT Page 16164 plaintiff's announcement to thousands of customers that it order for the lifetime guarantee promised in their initial contract for extermination services to be honored, the consumers would have to pay annual fees. The commission and the court characterized the conduct at issue as a party's unilateral alteration of contract terms. The Court noted that the commission had differentiated between the plaintiff's widespread infliction of an injury on consumers and a "simple breach of contract." Id. The clear implication is that a simple breach of contract is not a violation of the FTCA.
The plaintiff in this case has not cited and this court has not located any interpretation of the FTCA which construes a business person's failure to fulfill a representation to another business person as an unfair trade practice subject to the federal statute.
The federal courts construing the North Carolina Unfair Trade Practices Act, which closely resembles CUTPA, have ruled that "[a] simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act. . . ." Bartolomeo v. S.B.Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989); United Roasters, Inc.v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir.), cert. denied,454 U.S. 1054 (1981); Norman v. Loomis Fargo Co., 123 F. Sup.2d 985,988 (W.D.N.C. 2000). See also Emlee Equipment Leasing Corp. v.Waterbury-Transmission, Inc., 41 Conn. Sup. 575, 580 (1991) (striking a CUTPA claim based on breach of an agreement).
Fraudulent misrepresentation
To prevail on a claim of fraudulent misrepresentation, a plaintiff must prove that (1) a defendant made a representation as to a statement of fact, (2) the statement was untrue and was known to be untrue by the party who made it, (3) the statement was made to induce the plaintiff to act, and (4) the plaintiff acted on the false misrepresentation to his detriment. Weisman v. Kaspar, 233 Conn. 531, 539 (1995). Proof must be by "clear, precise and unequivocal evidence." Tyers v. Coma, 214 Conn. 8, 11
(1990).
This court has found that defendants Patel and Barot told Plotkin that in joining the team to put together a proposal for the housing authority, he would receive an unspecified share of proceeds and would serve as legal counsel for the project, along with Attorney Mosley. Attorney Mosley, whose brother had been an official at the Bridgeport Housing Authority, received the same assurance. Patel had no such intention at the time he made such statements to Plotkin. As soon as CCH-Florida had won the competition, Patel steered Barot to a different CT Page 16165 attorney, Robert Berchem, whom Patel had known for some fifteen years. Patel intended to share all developer profits with Barot, and not to include Plotkin in a division of profits.
Barot likewise had no intention of following through on his vague promises about fairness to team members. Having secured their services in putting together a proposal, and having taken advantage of their names, contacts, and reputations as local players, Barot cast them aside after winning the competition, treating the development project as belonging exclusively to his company. The cannier of the team members, Atluru and Hamid, quickly realized that they were providing free services and use of their facilities to Barot with no actual contract that entitled them either to a share of proceeds or fees for their services. They hired counsel and entered into contract negotiations with Barot and his companies.
In reliance on Patel's and Barot's representations concerning his role, Plotkin drafted the development agreement and spent some time scheduling meetings before he likewise realized that he was not being treated in the manner Barot and Patel had represented would occur.
At the same time they were making representations to Plotkin and the others concerning their prospects of sharing in the proceeds, Patel and Barot discussed the project between themselves with the intention that only two of them would divide the profits, though they never reached a definite agreement as to the share each would receive. Such duplicitous and secret negotiations are further evidence that Patel and Barot engaged in fraudulent misrepresentations at the time they led Plotkin to believe that he would share in the proceeds from the project. They made statements they knew to be contrary to their actual intentions with regard to division of profits, and they did so in order to induce Plotkin to perform legal services without charging them. Plotkin did so, and was not paid. Applying the standard of proof set forth above, this court finds that Plotkin has proven his claims of fraudulent misrepresentation against both Patel and Barot.
The vague but fervent promises by Patel and Barot to Plotkin that he and the other contributors to the proposal would be "participants" and "team members" lulled Plotkin into thinking that he did not have to proceed in the manner applicable to fee-for-service legal work, and he relied on these defendants' representations in devoting time to scheduling and attending some meetings and preparing an initial draft of a development agreement with the housing authority.
Negligent misrepresentation
CT Page 16166
The court has found that the misrepresentations made to Plotkin were not inadvertent but purposeful and fraudulent, and therefore the plaintiff has not proved this claim.
Breach of implied duty of good faith and fair dealing
"Every contract carries an implied covenant of good faith and fair dealing requiring neither party to do anything that will injure the right of the other to receive the benefits of the agreement." Gupta v. NewBritain General Hospital, 239 Conn. 574, 598 (1996); Habetz v. Condon, supra, 224 Conn. 238; Warner v. Konover, 210 Conn. 150, 155 (1989). This doctrine is a guide toward interpreting contracts, not a free-standing cause of action to be applied in the absence of a contract.
This court has found that the plaintiff has failed to prove that he entered into a definite, enforceable contract with any of the defendants. The doctrine invoked in the seventh count of his complaint is therefore inapplicable.
Third party beneficiary
Plotkin asserts that he should recover a portion of any profits from the project as a third party beneficiary of the development contract entered into between the housing authority and CCH-Florida and CCH-Bridgeport. The developer's right to profits derives not from the application to be the preferred developer, but from the developer agreement that the parties entered into after the developer won the right to negotiate the actual terms with the housing authority. (Ex. 11, p. 2.)
In order to prove a right to benefits as a third party beneficiary to a contract, a plaintiff must prove that the parties to the contract intended to assume a direct obligation to the plaintiff, even though the plaintiff was not a party to the contract. Grigerik v. Sharpe,247 Conn. 293, 311-12 (1998); Micci v. Thomas, 55 Conn. App. 14, 16-17
(1999). In Grigerik v. Sharpe, supra, 247 Conn. 311-12, the Supreme Court rejected the view that a third party's own expectations, or the intent of the contracting party with whom that third party was allied could confer third party beneficiary status:
 The law regarding the creation of contract rights in third parties in Connecticut is . . . well settled. In Knapp v. New Haven Road Construction Co., 150 Conn. 321, 325 . . . (1963), we quoted Colonial Discount Co. v. Avon Motors, Inc., 137 Conn. 196, 201 . . . (1950), and reaffirmed that "[t]he ultimate test to be applied CT Page 16167 [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." (Emphasis added; internal quotation marks omitted.) Although we explained that "it is not in all instances necessary that there be express language in the contract creating a direct obligation to the claimed third party beneficiary"; Knapp v. New Haven Road Construction Co., supra, [150 Conn.] 326; we emphasized that the only way a contract could create a direct obligation between a promisor and a third party beneficiary "would have to be, under our rule, because the parties to the contract so intended." Id.; see also Congress Daggett, Inc. v. Seamless Rubber Co., 145 Conn. 318, 324 . . . (1958); Pavano v. Western National Ins. Co., 139 Conn. 645, 648 . . . (1953); Colonial Discount Co. v. Avon Motors, Inc., supra, [137 Conn.] 200; Byram Lumber Supply Co. v. Page, 109 Conn. 256, 260 . . . (1929).
 The requirement that both contracting parties must intend to confer enforceable rights in a third party rests, in part at least, on the policy of certainty in enforcing contracts. That is, each party to a contract is entitled to know the scope of his or her obligations thereunder. That necessarily includes the range of potential third persons who may enforce the terms of the contract. Rooting the range of potential third parties in the intention of both parties, rather than in the intent of just one of the parties, is a sensible way of minimizing the risk that a contracting party will be held liable to one whom he neither knew, nor legitimately could be held to know, would ultimately be his contract obligee.
The plaintiff presented no evidence that the Bridgeport Housing Authority ever had any intent to assume any obligation to him. He has failed to establish his claim of entitlements as a third party beneficiary to any contract between the defendants and the housing authority, whether the contract is seen to be the request for proposal and award of status as preferred developer to CCH-Florida or the CT Page 16168 subsequent development contract.
Declaratory and injunctive relief
Plotkin asserts that he is entitled to a judgment declaring that he is a party to a contract by which he is entitled to a share of any profits realized from the housing project. In his post-trial brief he asserts that he seeks a declaration whether a joint venture exists and his rights thereunder. Plotkin also requests that the court enjoin the defendants from completing the housing project until the court determines whether or not he is entitled to be a member of the project team. The court has found that Plotkin achieved no definite enforceable contract with any of the defendants, and that in the absence of agreement as to the percentage or amount of the shares of the participants, no joint venture or contract exists.
Special defenses
Because the court has found that Plotkin did not enter into an enforceable joint venture agreement with the defendants and that declaratory and injunctive relief is not warranted, Barot's special defenses need not be addressed.
Defendants Patel and Capital Development Group, LLC filed special defenses to the effect that Barot's side-lining of Patel relieved Patel and his company of any liability to Plotkin. Essentially, Patel alleges that his conduct was not a proximate cause of any damage to Plotkin. While Patel did not have a direct role in asking Plotkin to attend meetings or draft a development contract after March 1996, his representations about Plotkin's status as a "team member," and his communications implying that Plotkin had an assured role as a team member were a proximate cause of Plotkin's willingness to perform services and to allow his name to be used on the proposal to the housing authority. Patel induced Plotkin to lend his name and any contacts to the venture even though Patel's subsequent conduct in bringing in another attorney clearly indicates that Patel had no intention of including Plotkin if the housing authority acted favorably on the application. Plotkin's performance of uncompensated services was a result of Patel's fraudulent misrepresentations. Patel's fraudulent insinuations, representations and actions continued to be a proximate cause of Plotkin's losses even after Patel himself had been abandoned by Barot.
Fraudulent misrepresentations by both Patel and Barot induced Plotkin to suffer losses from his detrimental reliance. The conduct of CCH-Florida in requesting Plotkin to perform some of the services represented as being part of his contribution as a team member did not CT Page 16169 constitute an intervening or superseding cause, as the inducement in which Patel had taken part continued to induce Plotkin to spend his time on the project without first obtaining a retainer agreement concerning payment for efforts. See Wasfi v. Chaddha, 218 Conn. 200, 213-14 (1991);Kiniry v. Danbury Hospital, 183 Conn. 448, 454-55 (1981) (actions that continue to be a proximate cause of injury even after another cause intervenes render actor liable to injured party).
Damages
Plotkin has prevailed on his claim of recovery in quantum meruit and on his claim for damages for fraudulent misrepresentation. Plotkin performed services the value of which this court has determined to be $6,125.00. He spent additional time conferring with others who had participated in preparing the CCH-Florida proposal concerning their predicament, but he did not demonstrate that this effort caused him to lose money from his legal practice, and he is not entitled to recover legal fees for time he has spent pursuing in this dispute merely because he is a lawyer. A tort claim for fraudulent misrepresentation is subject to the "American rule" concerning legal fees: that is, each party bears his own fees in the absence of an explicit fee-shifting statute or contract provision providing for recovery of fees. Rizzo Pool Co. v. Del Grosso, 240 Conn. 58, 72-73 (1997); Brookfield v. Candlewood Shores Estates, Inc., 201 Conn. 1,14 (1986); Gionfriddo v. Avis Rent A Car System, Inc., 192 Conn. 280, 297
(1984).
CCH-Florida, Patel and Barot are all liable for the $6,125.00 under these counts.
Another element of damage suffered by Plotkin as a result of defendants' fraudulent misrepresentation was the use of Plotkin's name and identification of him as a participant in a proposal by Barot and CCH-Bridgeport, even though Patel and Barot did not actually intend to have him involved throughout the project. Patel participated in fraudulently inducing Plotkin to lend his name to the enterprise. Plotkin has thus been identified in a public document as having a role in a project that has been woefully unsuccessful in actually developing housing units in the community where he resides. The court finds that the sum of $20,000 is just fair and reasonable compensation for this aspect of his damages.
Conclusion
Judgment shall enter in favor of the plaintiff against defendants Patel and Barot in the amount of $26,125.00. Judgment shall enter in favor of the plaintiff against defendant CCH-Florida in the amount of $6,125.00. CT Page 16170 The plaintiff may recover $6,125.00 from any one or more of these defendants. He may recover the remaining $20,000 jointly and severally from defendants Patel and Barot. The total amount of the judgment against all defendants is $26,125.00.
Judgment shall enter in favor of defendants CCH-Bridgeport and Capital Development Group, LLC, against whom the plaintiff failed to prove his claims.
The plaintiff shall recover his statutory court costs from the liable defendants upon filing a bill of costs with the clerk of the court.
Beverly J. Hodgson Judge of the Superior Court